# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZACK KIMBALL, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF SAN DIEGO; EMILIO CASTILLERO, <br><br> Defendants. | Case No. 24-cv-0682-BAS-VET <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 35)** |

Presently before the Court is a motion for summary judgment filed by Defendants County of San Diego and Deputy Emilio Castillero ("Defendants"). (ECF No. 35.) Plaintiff Zack Kimball ("Plaintiff") opposed. (ECF No. 36.) Defendants replied. (ECF No. 40.) The Court benefitted from oral argument to resolve the present motion. (ECF No. 48.) Upon review, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. (ECF No. 35.)

## I.    LEGAL STANDARD

A court's role at summary judgment "is to isolate and dispose of factually unsupported claims or defenses" so that they are "prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986). A court thus appropriately grants summary judgment if the moving party shows that there is no genuine issue of material fact and

- 1 -

entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material" fact "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248(1986). And a "genuine" issue of material fact means "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. The Court steers clear of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts." *Id*. And the Court need only consider the materials cited from the record. *See* Fed. R. Civ. P. 56(c)(3).

The burden-shifting scheme defines the motion for summary judgment. *See* Fed. R. Civ. P. 56(c). The party that moves for summary judgment initially carries the burden. *See Celotex*, 477 U.S. at 325; *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). To satisfy this burden, the movant can either: (1) present evidence that negates an essential element of the nonmovant's case, or (2) demonstrate that the nonmovant did not sufficiently support an essential element, on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23.

Assuming the movant meets his burden, the nonmovant must "go beyond the pleadings" and by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. The nonmovant cannot rely on "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986).

## II.   BACKGROUND

### A.   Factual Background

To set the factual context, the Court relies on Deputy Castillero's body-worn camera footage and the evidence as presented by Plaintiff.[1] Then, the Court enumerates the undisputed facts submitted by the parties. (ECF No. 37.)

---

[1] When ruling on a motion for summary judgment, a court can view the "facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). However, "[t]he mere existence of video

24cv0682

On August 29, 2023, a reporting party called 911 about an African American male standing at the end of his driveway, looking into vehicles in the neighborhood. (Ex. 2, ECF No. 36-2; Ex. 4, ECF No. 36-3.) The reporting party made no mention of weapons. (*Id*.; *see also* Castillero Decl. 202:1–3, 68:7–15, Ex. 21, ECF No. 35-9.) Deputy Castillero responded to the call. (Ex. 4, ECF No. 36-3.) In the five minutes before contacting Plaintiff, Deputy Castillero canvassed the neighborhood and did not see any burglarized cars. (Castillero Decl. 99:3–17.)

The footage begins with Deputy Castillero getting out of his car and pointing a light at Plaintiff. (Ex. C. 0:00:30, ECF No. 35-5.) Plaintiff is sitting on a wall, scrolling through his phone. (*Id*.) Deputy Castillero walks up to Plaintiff saying: "Hey, so the reason I am here is because I got a call referencing you—wearing the same attire—that was looking into vehicles. Do you live here in the neighborhood?" (*Id*. 0:00:32.) Plaintiff looks up from his phone and says: "I wasn't looking at vehicles." (*Id*. 0:00:40.) Deputy Castillero then states, "I know. But that's what was explained to me though." (*Id*. 0:00:42.)

During the conversation, Deputy Castillero is putting on his gloves and Plaintiff remains seated. (*Id*. 0:00:40–0:01:00.) Deputy Castillero follows up: "Do you live here in the area?" (*Id*. 0:00:47.) Plaintiff responds, "Yes, I do." (*Id*. 0:00:48.)[2] Deputy Castillero: "Where do you live at?" (*Id*. 0:00:49.) Plaintiff: "I am homeless right now, Sir. But I work at the Chevron, and my girlfriend is right here, I've been waiting for her…." (*Id*. 0:00:51.) Deputy Castillero: "Okay, are you currently on probation or parole?" (*Id*. 0:00:59.) Plaintiff: "No." (*Id*. 0:01:00)

With Plaintiff still seated, Deputy Castillero moves next to him, stating, "Do me a favor, put your hands behind your back real quick. Alright?" (*Id*. 0:01:02.) Plaintiff looks

_____

footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage," and "[t]he record is viewed in the light most favorable to the nonmovants[.]" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citations omitted). Accordingly, the Court will consider the footage and draw all reasonable inferences in Plaintiff's favor.

[2] Plaintiff lived in his van close to the Chevron. (Kimball Decl. 115:4–8, 117, Ex. 22, ECF No. 36-10; Ex. C. 0:05:48, ECF No. 35-5.)

- 3 -

up, asking, "What did I do wrong, Sir?" (*Id*. 0:01:05.) Deputy Castillero: "I am here, investigating you, looking at vehicles, I want to make sure nothing got broken into." (*Id*. 0:01:08.) Plaintiff: "I didn't look at no vehicles, Sir." (*Id*. 0:01:11.) Deputy Castillero interjects, "I understand. You're not under arrest. But you're going to be lawfully detained. Alright?" (*Id*. 0:01:14.)

Deputy Castillero elaborates, "I wanna make sure you didn't break into anything. That's all it is. Once I discover that you didn't, you'll be free to go, but for now you're lawfully detained. Alright? So put your hands behind your back." (*Id*. 0:01:17.) Plaintiff then says, "Hold on, Sir, let me just take a picture of this." (*Id*. 0:01:24.) Deputy Castillero responds, "Hey! We're not doing that. Alright?" (*Id*. 0:01:26.) As Plaintiff simultaneously says, "Why are you grabbing my stuff?" (*Id*. 0:01:27.) Deputy Castillero states, "You are lawfully detained. If you continue this, you are going to be placed under arrest," as Plaintiff says, "No, no, no." (*Id*. 0:01:30.)

The footage then shows Plaintiff raise his phone to record, saying, "I can film this, okay." (*Id*. 0:01:32.) Deputy Castillero knocks the phone out of Plaintiff's hand and grabs Plaintiff's wrist, stating, "Put your hands behind your back. Put your hands behind your back." (*Id*. 0:01:34.) Plaintiff, meanwhile, is asking, "What am I doing wrong? You need to tell me what I am doing wrong? Okay. I didn't break nothing." (*Id*. 0:01:36.) Deputy Castillero: "You are lawfully detained—I am investigating whether you broke into something or not. Put your hands behind your back." (*Id*. 0:01:40.)

With Deputy Castillero still grabbing his wrist, Plaintiff states, "I don't need to be put in handcuffs, Sir." (*Id*. 0:01:43.) Deputy Castillero answers, "You gotta go in handcuffs. I am not playing again." (*Id*. 0:01:45.) Plaintiff: "No, Sir, I am asking you please...." (*Id*. 0:01:47.) Deputy Castillero then radios in, "231—I have one uncooperative, I need units please." (*Id*. 0:01:48.) Plaintiff then states, "Okay, but I am not going to..."—interjected by Deputy Castillero commanding, "Put your hands behind you back"—"…jail today, Sir. I didn't do nothing wrong." (*Id*. 0:01:52.) Deputy Castillero asserts: "Put your hands behind your back. I am not going to tell you again." (*Id*. 0:01:57.)

24cv0682

With Deputy Castillero still holding on to Plaintiff's wrist, their back and forth continues. (*Id*. 0:01:58.) Plaintiff says, "Okay. I am waiting for my… Sir you don't have to put me in…handcuffs." (*Id*. 0:01:59.) Deputy Castillero: "I already explained it to you." (*Id*. 0:02:02.) Plaintiff: "Sir… I will take off everything." (*Id*. 0:02:03) Deputy Castillero: "I want to make sure nothing got broken into and once I discover that… I investigate that… We'll be good to go." (*Id*. 0:02:04.) Deputy Castillero continues, "Put your hands behind your back—I am not going to tell you again." (*Id*. 0:02:08.) Plaintiff says, "Okay, okay." (*Id*. 0:02:10.) Deputy Castillero: "Put your hands behind your back or else I am going to use force." (*Id*. 0:02:11.) A second later, Deputy Castillero starts applying force on Plaintiff's wrist. (*Id*. 0:02:12.) Plaintiff can be heard asking, "Can I do it myself? Can I do it myself?" (*Id*. 0:02:14.) Then, for several seconds, the footage goes black. (*Id*.) One can hear scuffling noises and indistinct words. (*Id*. 0:02:17–0:02:52.)

When the footage returns, Plaintiff is on the street, face down, his hands behind his back, and Deputy Castillero over him. (*Id*. 0:02:54.) Deputy Castillero states, "Put your hands behind your back." (*Id*. 0:02:50.) And Plaintiff responds, "Okay, you're f***ing crazy dude. What is wrong with you? I didn't do a d*** thing." (*Id*. 0:02:52.) Several seconds of silence ensues. (*Id*. 0:02:59.) Then Plaintiff shouts: "Malibu," and Deputy Castillero says, "Stay on the ground." (*Id*. 0:03:05.)[3]

Still face down on the ground, Plaintiff shares a few more expletives. (*Id*. 0:03:10.) As Deputy Castillero prepares to strap on the handcuffs, Plaintiff says, "So when you see that nothing was broken in, you're going to let me go, right?" (*Id*. 0:03:24.) Deputy Castillero, however, says: "Now you're under arrest." (*Id*. 0:03:26.) Plaintiff: "For what?" (*Id*. 0:03:27.) Deputy Castillero: "For resisting." (*Id*. 0:03:28.) Plaintiff: "Resisting what? You were grabbing me, and you weren't letting me do it?" (*Id*. 0:03:29.) Deputy Castillero: "You're under arrest." (*Id*. 0:03:34.) Plaintiff: "For what?" (*Id*. 0:03:35.) Deputy Castillero: "For obstruction and resisting." (*Id*. 0:03:36.) Plaintiff remains face down on the ground as

---

[3] The footage later shows Plaintiff telling one of the deputies that his girlfriend's first name is "Malibu." (Ex. C. 0:08:06; Kimball Decl. 135:1–5.)

24cv0682

Deputy Castillero reports: "231—I got one detained use of force." (*Id*. 0:03:41.) Plaintiff: "I didn't use no force on you, Sir." (*Id*. 0:03:45.) Deputy Castillero continues to key into his radio, "231—I will be out by where the [reporting party's] home is." (*Id*. 0:03:52.)

Deputy Castillero then asks Plaintiff, "Do you have any injuries?" (*Id*. 0:04:04.) Plaintiff responds, "Uh, yeah, Sir…" (*Id*. 0:04:06.) Deputy Castillero questions, "What injuries do you have?" (*Id*. 0:04:07.) To which Plaintiff says, "My back because you f***ing threw me on the ground for no reason." (*Id*. 0:04:08.) Deputy Castillero then requests an ambulance. (*Id*. 0:04:13.) Plaintiff can be heard saying, "So extra for no reason…." (*Id*. 0:04:29.) Several seconds of silence. (*Id*. 0:04:30.) Then Deputy Castillero says, "I explained to you what was going on, dude…." (*Id*. 0:04:29.) Plaintiff: "And I told you the truth, man." (*Id*. 0:04:41.) Deputy Castillero: "Now you're under arrest, alright?" (*Id*. 0:04:43.) Plaintiff: "For what though?" (*Id*. 0:04:45.)

Plaintiff and Deputy Castillero continue to talk over each other. (*Id*. 0:04:46.) Plaintiff: "I didn't do nothing wrong." (*Id*. 0:04:47.) Deputy Castillero: "I already explained to you. You were lawfully detained, and you were resisting me, alright?" (*Id*. 0:04:48.) Plaintiff: "No, Sir, you were unlawfully detaining me. I am telling you that right now." (*Id*. 0:04:50.) Deputy Castillero: "I explained to you why I was here and what was going on." (*Id*. 0:04:52.) Plaintiff: "But it sounds like 'bs' to me, Sir. Okay. I will hire a lawyer and fight this because it doesn't make no sense." (*Id*. 0:04:55.) Deputy Castillero: "Alright go ahead." (*Id*. 0:05:00.) Sirens can be heard in the background, and Plaintiff remains on the ground face down with Deputy Castillero positioned over him. (*Id*. 0:04:57.)

Deputy Castillero then asks, "Do you have anything with your ID on you?" (*Id*. 0:05:02.) Plaintiff responds, "No, I don't." (*Id*. 0:05:03.) Plaintiff then says, "I don't know why the f*** I will go to jail for no reason." (*Id*. 0:05:10.) Deputy Castillero then states, "You're going to jail, dude, we're past that." (*Id*. 0:05:12.) Plaintiff: "No, no, no, I didn't do a thing wrong." (*Id*. 0:05:13.)

The siren sounds get closer, and Deputy Castillero turns Plaintiff over to a seated position. (*Id*. 0:05:20.) "Tuck your leg in."—Deputy Castillero commands twice. (*Id*.

24cv0682

0:05:22.) Plaintiff: "What leg in?" (*Id*. 0:05:23.) Deputy Castillero: "That one; tuck it in." (*Id*. 0:05:24.) He continues, "So you're now under arrest for resisting, alright?..." — Plaintiff: "Okay." —"…and I am going to get your name in a bit…"—Plaintiff: "Okay." —"…I explained to you that you were lawfully detained…"—Plaintiff: "Sir, I didn't do nothing wrong." —"… and you didn't get with the program." (*Id*. 0:05:27.)

Another officer walks into the video frame. (*Id*. 0:05:36.) Plaintiff begins speaking with the other deputy. (*Id*. 0:05:37.) The footage shows that at least three other deputies have arrived on the scene. (*Id*. 0:05:55.) Deputy Castillero tells another officer to take photos of the area. (*Id*. 0:05:57.)

With Plaintiff still sitting on the ground, Deputy Castillero rests his hand on Plaintiff's shoulder: "Alright, listen here buddy, so you're under arrest…." (*Id*. 0:06:06.) Plaintiff asks, "For what though?" (*Id*. 0:06:08.) Deputy Castillero: "…I already told you, for 148…I told you…you were lawfully detained, I told you numerous times…." (*Id*. 0:06:10.) Plaintiff interjects: "You didn't give me no reason as to why." (*Id*. 0:06:14.) Deputy Castillero continues, "…and you started moving away from me." (*Id*. 0:06:15.) Plaintiff: "No, I didn't pull away from you." (*Id*. 0:06:16.) Deputy Castillero: "I told you I was investigating...." (*Id*. 0:06:18.)

Plaintiff then turns his head around to face Deputy Castillero, asking: "Do you have a camera?" (*Id*. 0:06:19.) Deputy Castillero then reaches down for Plaintiff's handcuffs, saying, "Alright, we are done talking. Put your leg in. Put your leg in." (*Id*. 0:06:20.) Plaintiff: "Why don't you have your camera on you, man?" (*Id*. 0:06:22.) Deputy Castillero: "Yes, it's on. It captured everything." (*Id*. 0:06:24.) Plaintiff then says, "Okay. Well I filmed you slapping my f***ing phone." (*Id*. 0:06:25.) Deputy Castillero: "I know, I did." (*Id*. 0:06:28.) Plaintiff: "Okay. Okay. Grab my arms and I will stand up." (*Id*. 0:06:29.) Deputy Castillero: "Put your leg in and I'm gonna roll you to your hands and then to your feet." (*Id*. 0:06:31.)

Deputy Castillero then walks Plaintiff to the sheriff vehicle. (*Id*. 0:06:41.) Deputy Castillero leans Plaintiff over the car, (*id*. 0:06:47), and pats down Plaintiff, asking: "Do

you have anything that is going to poke or stick me?" (*Id*. 0:06:52.) Plaintiff responds, "No, I don't have nothing. I'm not doing nothing wrong…." (*Id*. 0:06:53.) Deputy Castillero then asks: "What is your name?" (*Id*. 0:07:00.) Plaintiff: "My name is Zack Kimball, Sir." (*Id*. 0:07:01.) Deputy Castillero then tells another deputy, "Can one of you guys contact the [reporting party], make sure none of her vehicles were broken into?" (*Id*. 0:07:11.) Throughout this process, Plaintiff repeatedly asks for someone to get his phone from the bushes. (*Id*. 0:06:47–0:08:54.)

Deputy Castillero seats Plaintiff in the sheriff vehicle. (*Id*. 0:09:06.) Deputy Castillero and Plaintiff continue to argue back and forth about the encounter. (*Id*. 0:09:08–0:10:34.) The footage further shows a conversation with the reporting party, discussion with ambulance staff, and exchanges amongst the deputies. (*Id*. 0:11:11–0:15:00.) The footage ends with Plaintiff getting into the ambulance. (*Id*. 0:17:03.)

The ambulance took Plaintiff to the hospital. (Kimball Decl. 187:3–4, Ex. 22, ECF No. 36-10.) There, Deputy Castillero handcuffed Plaintiff to the bed. (*Id*. 142:5–7.) Plaintiff had to use the restroom, and Deputy Castillero did not uncuff Plaintiff from the bed. (*Id*.) A nurse provided a urinal bottle instead; Plaintiff used it and the bottle overflowed. (*Id*. 184:8–16, 142:3–5.) Plaintiff urinated on himself. (*Id*. 142:9–10.)

Later, Deputy Castillero submitted a probable cause declaration to the district attorney's office. (Ex. 18, ECF No. 36-7.) A district attorney brought charges; however, after speaking with Deputy Castillero, the charges were dropped in the interest of justice. (Ex. 19, ECF 36-8.)

The parties submitted a joint statement of undisputed facts, agreeing on the following. (ECF No. 37.) Deputy Castillero responded to a call, arriving at 964 Sandcastle Drive approximately thirty minutes after the initial call was made. (*Id*.) After Deputy Castillero arrived on scene, he contacted Plaintiff. (*Id*.) Deputy Castillero first told Plaintiff that he was contacting him because he got a call referencing Plaintiff, wearing the same attire [as the individual] looking into vehicles. (*Id*.) Plaintiff said, "I wasn't looking at vehicles" to which Deputy Castillero responded, "I know; that is what was explained to me

- 8 -

24cv0682

though." (*Id*.) Deputy Castillero then asked Plaintiff if he lived in the area, to which Plaintiff replied, "Yes I do." (*Id*.) Deputy Castillero asked Plaintiff if he was on probation or parole, to which Plaintiff said, "No." (*Id*.) Deputy Castillero then asked Plaintiff to put his hands behind his back. (*Id*.) At the scene, Plaintiff complained of pain to his neck and back. (*Id*.) Deputy Castillero called for an ambulance. (*Id*.) The District Attorney's Office filed a misdemeanor charge for Penal Code § 148(a)(1) against Plaintiff. (*Id*.) Prior to the April 29, 2023 incident, Deputy Castillero did not recall any contact with Plaintiff. (*Id*.)

### B. Procedural Background

Plaintiff filed a complaint on April 16, 2024. (ECF No. 1.) Defendants moved to dismiss the complaint for failure to state a claim. (ECF No. 5.) Plaintiff then submitted a first amended complaint. (ECF No. 6.) The Court subsequently denied as moot Defendants' motion to dismiss. (ECF No. 7.) Defendants filed an answer. (ECF No. 8.)

In a joint motion, Plaintiff sought leave to file a second amended complaint, which the Court accepted. (ECF Nos. 15, 16.) Plaintiff filed a second amended complaint, and the case proceeded to discovery. (ECF No. 17.) Defendants then filed a motion for summary judgment. (ECF No. 35.) The motion has been fully briefed. (ECF Nos. 36, 40.)

Plaintiff's second amended complaint alleges ten claims. (ECF No. 17.) Plaintiff brings six claims under 42 U.S.C. § 1983, alleging First Amendment violations, Fourth Amendment unlawful detention and arrest, Fourth Amendment excessive force, Fourth Amendment malicious prosecution, *Monell* liability against the County of San Diego, and Fourteenth Amendment unlawful conditions of confinement. (*Id*.) Plaintiff further brings four California state law claims, alleging negligence, battery, false arrest, and a Bane Act violation. (*Id*.)

### III. ANALYSIS

First, the Court addresses Plaintiff's federal causes of action. Next, the Court discusses Plaintiff's state law claims.

24cv0682

## A.    Federal Law Claims

Defendants seek qualified immunity on all § 1983 claims except the *Monell*, malicious prosecution, and excessive force claims. Qualified immunity protects officers from going to trial on "insubstantial lawsuits." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The Supreme Court made the immunity "qualified" to carve out situations where a "reasonable [officer] would have known" about a constitutional right. *Harlow*, 457 U.S. at 818–19 ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.").

To determine whether an officer should receive qualified immunity, a court considers: (A) "whether a constitutional right would have been violated on the facts alleged" and (B) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). A court can take these questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). And a court can skip the constitutional question. *Id.*

Clearly established means the "contours of the right" were "sufficiently clear" so that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, the law should place the existence of a right "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And it should affirm the right "under similar circumstances." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted). Nevertheless, the qualified immunity analysis does not require a case "directly on point." *Ashcroft*, 563 U.S. at 741. In a rare, "obvious" case, the violation of a constitutional right may be clear even without similar circumstances. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

When analyzing a qualified immunity defense at summary judgment, the court must draw reasonable inferences in favor of the non-movant. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014). And "[i]t is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018) (citation omitted).

24cv0682

### 1.    Fourth Amendment – Unlawful Detention and Arrest

Defendants move for summary judgment on the Fourth Amendment unlawful seizure claim, seeking qualified immunity. (Mot. 5:27–6:1.) The Fourth Amendment to the U.S. Constitution provides, in relevant part: "The right of the people to be secure in their persons, houses, paper, and effects against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. The Constitution thus permits government seizures to the extent they are reasonable. *See Elkins v. United States*, 364 U.S. 206, 222 (1960). The Court generally views reasonableness through an objective lens. *See Beck v. State of Ohio*, 379 U.S. 89, 96 (1964) (noting that "it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed" (citation omitted)).

The Supreme Court has identified two categories of government seizures. First, an arrest based on "probable cause." *See Katz v. United States*, 389 U.S. 347, 357 (1967). The Ninth Circuit defines probable cause as "reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused has committed or was committing an offense." *Allen v. City of Portland,* 73 F.3d 232, 237 (9th Cir. 1995) (citation modified). Later, the Court recognized an investigative stop, also known as a "*Terry* Stop," which requires a showing of "reasonable suspicion" that "the person apprehended is committing or has committed a criminal offense." *Terry v. Ohio*, 392 U.S. 1, 16 (1968); *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).

To determine whether an officer engaged in a reasonable investigative stop, the Supreme Court has outlined a "dual" inquiry: to start, a court asks, "whether the officer's action was justified at its inception" and next, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20. For this dual inquiry, the Court relies on the "totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014). And an officer needs to "point to specific and articulable facts" to support reasonable suspicion, rather than "inarticulate hunches." *Terry*, 392 U.S. at 21–22.

24cv0682

Here, as agreed by the parties at oral argument, Deputy Castillero had reasonable suspicion to initiate a *Terry* stop. (ECF No. 48.)

Even though Deputy Castillero reasonably initiated the stop, that is only half the inquiry. At issue is whether handcuffing Plaintiff was reasonably related in scope to the circumstances which justified the stop. *See Terry*, 392 U.S. at 28–29 ("The manner in which the seizure [was] conducted is, of course, as vital a part of the inquiry as whether [it was] warranted at all."). To frame the argument another way, Plaintiff suggests the intrusiveness of handcuffs turned the encounter into a de facto arrest without probable cause.[4]

Handcuffing "is not part of a typical *Terry* Stop" and "substantially aggravates the intrusiveness of an otherwise routine investigatory detention." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) cert. denied 459 U.S. 1211 (1983). Nevertheless, the use of handcuffs, "if not excessive under the circumstances," does not necessarily transform an investigative stop into an arrest. *Id.* at 1289.

In limited circumstances, the Ninth Circuit has permitted intrusive techniques during an investigative stop, namely where: (1) the suspect's actions raise the possibility of danger or flight; (2) the suspect is armed, according to officer's information; (3) the *Terry* Stop follows a violent crime; and (4) a violent crime is imminent, according to officer's information. *See Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996).[5]

---

[4] In their summary judgment motion, Defendants argue Deputy Castillero engaged in a lawful arrest with probable cause because Plaintiff resisted the investigative stop in violation of Penal Code § 148. (Mot. 9:12–14, 11:20–13:24.) But, as relevant to the Court's present inquiry, Defendants do not argue that Deputy Castillero had probable cause to arrest Plaintiff for breaking into cars or burglary. *See, e.g.*, *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (reversing summary judgment in an officer's favor for an arrest under Penal Code § 148 where "there was certainly sufficient evidence […] on which a reasonable jury could have concluded that no probable cause existed, based both on evidence that [the plaintiff] did not in fact resist [the officer] and evidence that [the plaintiff] did not impede [the officer] in the exercise of his *lawful* duties[.]" (emphasis in original)). To the extent Defendants argue the existence of probable cause based on the Penal Code § 148 violation, the Court rejects the applicability of the argument to the analysis.

[5] The *Washington* court further included as considerations the "specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought," the "specificity of information that the persons actually being sought are likely to forcibly resist

- 12 -

Here, a jury could find that Deputy Castillero lacked a reasonable indication of danger or flight; Plaintiff stayed and answered Deputy Castillero's questions. (Ex. C. 0:00:40.) Further, there were no reports that anyone was armed. (Ex. 2, ECF No. 36-2; Ex. 4, ECF No. 36-3.) Nor did the stop follow a violent crime; in fact, no crime was reported. (*Id.*) Finally, Deputy Castillero did not have information that a crime involving violence was about to occur; Plaintiff was sitting on a wall scrolling through his phone. (Ex. C. 0:00:32.)[6]

At oral argument, given the opportunity to justify the handcuffs based on the objective facts Deputy Castillero faced, Defendants did not identify an applicable *Washington* factor, nor facts that would support one. (ECF No. 48.)[7] Instead, Defendants referenced the statement that officers are "authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235–36 (1985) (finding a *Terry* stop reasonable where the suspects were "reported to be armed and dangerous"). But

---

police interrogation," and the "number of police officers present." *Washington v. Lambert*, 98 F.3d 1181, 1190 (9th Cir. 1996). Given that none of the four primary *Washington* factors have been met, the Court does not analyze these additional considerations.

[6] The Ninth Circuit's decision *United States v. Bautista* is a relevant comparison, highlighting circumstances under which an officer reasonably escalates an investigatory stop. 684 F.2d at 1286. In *Bautista*, immediately following a bank robbery, the officer stopped two men suspected of the robbery. *Id.* at 1287. The officer handcuffed the two men. *Id.* The court permitted the use of handcuffs, especially because "the suspects appeared extremely nervous" and "suspect Bautista kept pacing back and forth and looking, turning his head back and forth as if he was thinking about running." *Id.* at 1289. The Ninth Circuit emphasized that the two men were "suspected of robbery in which three men with guns participated," with the danger that "the third robber might still have been in the vicinity." *Id.* at 1289–90. The Court fails to see circumstances similar to *Bautista* that Defendants may rely on. When Deputy Castillero responded to a report of someone looking into vehicles, Plaintiff made no attempt to flee, displayed no signs of flight, and was reported to be unarmed.

[7] Defendants also mention, in their brief and at oral argument, that Deputy Castillero twice at a minimum declared that Plaintiff would be let go if the officer determined that no vehicles had been broken into. (Mot. 8:15–16; ECF No. 48.) But a constitutional violation is not remedied because one could be "let go" later. As the Supreme Court has highlighted, an investigatory stop "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17 (1968).

- 13 -

24cv0682

Defendants still did not grapple with the *Washington* guardrails, which outline when an officer may use handcuffs to reasonably protect personal safety.

In truth, Defendants' advocacy seemed to drop the protections of reasonableness altogether, arguing that Deputy Castillero's concerns for personal safety necessitated the handcuffs. But the Court rejects that argument as it would render the *Washington* factors meaningless—the exception would become the rule, and handcuffing would be routinely justified in virtually any *Terry* stop. In other words, Defendants' argument would allow an officer's correlation between a potential crime and its associated dangers to justify handcuffs in the name of personal safety during any *Terry* stop. *See, e.g.*, *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1048 (9th Cir. 2014) ("The fact that Green was stopped on suspicion of a stolen vehicle does not by itself demonstrate that she presented a danger to the officers."); *see also Chinaryan v. City of Los Angeles*, 113 F.4th 888, 898 (9th Cir. 2024), cert. denied sub nom. *Cueto v. Chinaryan*, 145 S. Ct. 1927, 221 L. Ed. 2d 667 (2025) ("Although vehicle theft is an 'arguably severe' crime, the officers had no articulable basis to suspect that plaintiffs posed a threat to anyone beyond the generic threat that a suspected vehicle thief poses." (citation omitted)).

And a *Terry* frisk already affords officers a constitutionally sanctioned means of addressing safety concerns short of handcuffing. *See Terry*, 392 U.S. at 7, 27 (describing an officer stopping three men and patting down the outside of their clothing to check for weapons); *see also Sialoi v. City of San Diego*, 823 F.3d 1223, 1236 (9th Cir. 2016). "While [the Court] must not compel police officers to take unnecessary risks, total security is possible, if at all, only in a society that puts a much lesser premium on freedom than does ours." *Washington*, 98 F.3d at 1187.

The Court therefore recognizes a genuine dispute of material fact as to whether Deputy Castillero stayed within the scope of a reasonable investigative stop. In other words, relying on the totality of circumstances, a jury could find the application of handcuffs exceeded the limits of a reasonable investigative stop, transforming the encounter into a de facto arrest without probable cause. Accordingly, the Court denies

- 14 -

Defendants' motion for summary judgment on the Fourth Amendment unlawful seizure claim.

The Court next asks whether the Fourth Amendment right to be free from highly intrusive measures absent special circumstances during a *Terry* stop was clearly established. The Court finds it was.

In the Ninth Circuit, "if the *Terry*-stop suspects are cooperative and the officers do not have specific information that they are armed or specific information linking them to a recent or inchoate dangerous crime, the use of such aggressive and highly intrusive tactics is not warranted, at least when […] there are no other extraordinary circumstances involved." *Washington*, 98 F.3d at 1192; *Green*, 751 F.3d at 1052; *see, e.g.*, *Chinaryan*, 113 F.4th at 893 (finding that, taking into account *Washington* and *Green*, it was clearly established that "officers can be held liable for conducting a high-risk vehicle stop based on nothing more than a reasonable suspicion that the vehicle was stolen").

And this right was clearly established under similar circumstances. For example, in *Washington*, a police bulletin outlined the heights and weights of two African American suspects and stated that "they were considered armed and dangerous." 98 F.3d at 1183–84. Around midnight, an officer thought two men at a Carl's Jr. resembled the suspects' descriptions. *Id*. at 1183. Based on the similarity, the officer initiated a *Terry* stop that involved the intrusive tactic of handcuffs. *Id*. at 1184, 1190. In addition to relying on the presumed physical similarity, officers attempted to justify the intrusive stop by noting the late hour and behavioral contradictions. *Id.* at 1191–92. But the Ninth Circuit found "of no significance" that it was night and that the detainee appeared both "nervous" and "casual" to the officer. *Id.* at 1193. The Ninth Circuit affirmed the district court's denial of qualified immunity. *Id.* at 1183, 1192 ("At most there were two African American men, one short and one tall, in the city of Santa Monica, at night, who appeared to a police officer to be both nervous and casual. This case is not a close one; any reasonable juror would be compelled to find on these facts that the stop was an arrest.").

- 15 -

The facts, here, track the facts in *Washington* closely. Deputy Castillero had a meager amount of information about Plaintiff, besides a general, physical description. (Ex. 2, ECF No. 36-2; Ex. 4, ECF No. 36-3.) Deputy Castillero did not have information that Plaintiff was armed, nor that a recent, dangerous crime took place. (*Id*.) Plaintiff complied and answered Deputy Castillero's questions. (Ex. C. 0:00:40.) And the hour of night along with Plaintiff's seemingly contradictory statements are not extraordinary considerations. (*Id*. 0:00:48.)

Under these circumstances, a reasonable officer would have known that the intrusive measure of handcuffs during an investigatory *Terry* stop was unlawful. Accordingly, Deputy Castillero is not entitled to qualified immunity for the Fourth Amendment unlawful seizure claim.

### 2.    Fourth Amendment – Excessive Force

Defendants next move for summary judgment on Plaintiff's excessive force claim. (Mot. 15:14–20.) Excessive force is analyzed under the Fourth Amendment's objective "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). To decide reasonableness in this context, one balances (A) the "nature and quality of the intrusion" against (B) the "countervailing governmental interests at stake." *Id*. at 396 (citation omitted).

The balancing requires "careful attention to the facts and circumstances of each particular case," including consideration of: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citation omitted). Of these, "the most important *Graham* factor is whether the suspect posed an immediate threat to the safety of officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citation modified). Looking at the totality of circumstances, the court may weigh other appropriate factors as well. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (noting that a court considers "the totality of the circumstances […] whether or not listed in *Graham*").

- 16 -

To determine if an individual poses an immediate threat, a "simple statement by an officer that he fears for his safety or the safety of others is not enough," instead, "there must be objective factors to justify such a concern." *Mattos*, 661 F.3d at 441–42 (citation omitted). And "[r]esistance, or the reasonable perception of resistance," does "not entitle police officers to use *any* amount of force to restrain a suspect." *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013) (emphasis in original). Further, "[i]t is a well-worn principle in [Ninth Circuit] law that when there is no need for force, any force used is constitutionally unreasonable." *Gonzalez v. City of Phoenix*, 163 F.4th 1289, 1301 (9th Cir. 2026) (citation omitted).

Here, the intrusion involved the forced application of handcuffs. Believing Plaintiff's evidence, he claims Deputy Castillero "grabbed [his] right wrist and then pulled [him] up from sitting down and instantly tackles [him] and kicked [his] feet and tackles [him] to the ground." (Kimball Decl. 134:14–16; *see also* Castillero Decl. 121:6–17.) Plaintiff further describes the force: "What I remember after he kicked my legs, and I was already falling to the ground. This dude jumped up on top to. [sic] Like, he really tried to put all of his weight shifted like slam my face on the ground." (Kimball Decl. 134:20–22.) Plaintiff also maintains that he was neither resisting nor attempting to flee. (Opp'n 15:22–24; Kimball Decl. 180:15–22.)

Turning to the countervailing governmental interests, Defendants acknowledge that "while the crime Deputy Castillero suspected Plaintiff of was not necessarily severe,"—the first *Graham* factor—Plaintiff nevertheless posed an immediate threat. (Mot. 14:28–15:2.) Specifically, Defendants argue that Deputy Castillero was by himself, knew that Plaintiff had not been patted down for weapons, and was trained that burglary suspects often carry burglary tools. (Reply 6:8–11, ECF No. 40.) In addition, Defendants argue that Plaintiff was resisting and attempting to flee. (Mot 15:10–11; Castillero Decl. 139:3–4.)[8]

---

[8] Defendants use the declaration of a police practices expert to corroborate Deputy Castillero's testimony that his detention and use of force were consistent with standard police tactics. (Fonzi Decl.,

24cv0682

Here, the *Graham* factors support a genuine issue of material fact. In balance, whether Plaintiff was resisting the seizure or whether Deputy Castillero's force was reasonable to overcome the resistance remains a genuine issue. Nor can the Court say as a matter of law that objective factors support an immediate threat to Deputy Castillero's safety beyond, for example, Deputy Castillero's statement that he feared for his safety. And as acknowledged by Defendants, the crime at issue was not severe. (Mot. 15:1.)

A reasonable jury could conclude that Deputy Castillero employed unreasonable force in applying handcuffs to Plaintiff. Therefore, the Court denies summary judgment on the excessive force claim.[9]

### 3.    Fourth Amendment – Malicious Prosecution

Defendants move for summary judgment on Plaintiff's Fourth Amendment malicious prosecution claim. (Mot. 21:14.) An individual's Fourth Amendment right to be free from unreasonable seizures can be violated if a government official brings charges without probable cause. *Thompson v. Clark*, 596 U.S. 36, 42 (2022). Such malicious prosecution effectively causes the plaintiff to be seized without probable cause. *Id*. Relying on the elements of the state-law tort of malicious prosecution, a plaintiff must show the following: "(i) the suit or proceeding was instituted without any probable cause; (ii) the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution terminated in the acquittal or discharge of the accused." *Id*. at 44 (citation modified).

A prosecutor is presumed to exercise independent judgment when filing charges. *See Newman v. Cnty. of Orange*, 457 F.3d 991, 994 (9th Cir. 2006). Thus, when a plaintiff seeks "to hold investigating police officers liable for malicious prosecution," he "must

---

ECF No. 35-7.) But having such a declaration does not absolve the Court of its responsibility to determine reasonableness and balance the *Graham* factors at the summary judgment stage.

[9] For the excessive force claim, Defendants neither raise qualified immunity in their motion nor in their reply brief. (Mot. 13:25–15:20; Reply 5:14–6:27, ECF No. 40.) The Court therefore considers the defense waived for purposes of the motion.

24cv0682

overcome the presumption that the prosecutor exercised independent judgment in bringing criminal charges." *Gonzalez v. Cnty. of Los Angeles*, No. 22-55386, 2023 WL 5951015, at *2 (9th Cir. Sept. 13, 2023).

The plaintiff bears the burden of producing evidence to rebut the presumption. *See Newman*, 457 F.3d at 993. Specifically, the court looks for evidence that: (1) "the district attorney was subjected to unreasonable pressure by the police officers," (2) "the officers knowingly withheld relevant information with the intent to harm [the plaintiff]," or (3) "the officers knowingly supplied false information." *Id.* at 994. The "*plaintiff's account* of the incident in question, by itself, does not overcome the presumption of independent judgment." *Id.* (emphasis in original). Instead, courts have relied on evidence such as the corroboration of an independent witness, or factual incongruencies between the officers' accounts. *See id.*

Here, Plaintiff has not satisfactorily rebutted the presumption of the prosecutor's independent judgment. Other than his own account of the events, Plaintiff has not offered independent evidence. More pointedly, Plaintiff does not indicate that Deputy Castillero exercised unreasonable pressure on the prosecutor, that Deputy Castillero withheld relevant information with intent to harm, nor that Deputy Castillero offered false information. If anything, Plaintiff seemingly argues that the prosecutor should have interviewed Deputy Castillero before filling charges, but that argument cannot support a claim here. (Opp'n 17:8–10.)

No reasonable jury could find in Plaintiff's favor. Accordingly, the Court grants summary judgment in Defendants' favor on the Fourth Amendment malicious prosecution claim.

### 4. First Amendment – Interference and Retaliation

Defendants move for summary judgment on Plaintiff's First Amendment claims, seeking qualified immunity. (Mot. 5:14–20.)

The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law […] abridging the freedom of speech, or of the press; or the

24cv0682

right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

The First Amendment protects public discourse about the government. *See Mills v. State of Alabama*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."). The protection includes the right to gather information "concerning public officials," *see Garrison v. Louisiana*, 379 U.S. 64, 77 (1964), and the right to disseminate information "relating to alleged governmental misconduct," *see Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1035 (1991). More specifically, in the Ninth Circuit, individuals possess a "First Amendment right to film matters of public interest." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

The *Fordyce* decision asserted the right to record officers in public spaces performing their public duties. *Id*. at 436. There, the plaintiff was videotaping a public protest, where "[a]mong his subjects were the activities of the police officers assigned to work the event." *Id*. at 438. The plaintiff claimed that an officer attempted "physically to dissuade" him from recording the public protest. *Id*. After establishing the plaintiff's First Amendment right to record the officers, the court remanded for fact finding. *Id*. at 442.

Here, the Court asks whether the right to record an officer was clearly established under similar circumstances. Although both the plaintiff in *Fordyce* and here attempted to record an officer in a public space performing a matter of public interest, the right was not established under similar circumstances. *Fordyce* and similar cases establish that a bystander may record an officer making an arrest—not that the arrestee may record their own arrest. *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 79–80 (1st Cir. 2011) (denying an officer qualified immunity for First Amendment violations where the plaintiff, standing ten feet away, filmed several officers arresting someone else in a public space). None of Plaintiff's cases address the precise conflict at issue: whether an individual being actively seized retains a First Amendment right to film that seizure. (Opp'n 8:11–10:9; ECF No.

24cv0682

48.) Plaintiff is not observing police conduct from a distance, he is the subject of it. *Cf. Smith v. Cnty. of Orange*, 678 F. Supp. 3d 1182, 1205 (C.D. Cal. 2023) (finding that the right to record was clearly established under similar circumstances, despite some factual dissimilarities, because the plaintiff was "simply engaging in the First Amendment protected activity of observing a government operation by video recording the Deputies" (citation modified)). Accordingly, the Court denies summary judgment as to the First Amendment claim.

Relatedly, Defendants move for summary judgment on Plaintiff's First Amendment retaliation claim. (Mot. 4:25–5:2.) The First Amendment "forbids government officials from retaliating against individuals for speaking out." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). For a plaintiff to allege First Amendment retaliation, he must show that: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Id.* at 543.

Here, Plaintiff argues that when he shared his intent to record, Deputy Castillero then used force. (Opp'n 9:8–11.) Defendants successfully undercut the retaliation claim by relying on the timing of events. (Mot. 5:8–11.) In particular, Defendants argue that Deputy Castillero planned to handcuff Plaintiff "*before*" Plaintiff pulled out his phone. (*Id.*) Given this sequence, Plaintiff's filming was not the but-for cause of the force. (*Id.*); *see Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019) ("It is not enough to show that an official acted with a retaliatory motive […] it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.").

Without a substantial causal relationship, Plaintiff cannot prevail on this claim. Accordingly, the Court grants summary judgment in Defendants' favor on the First Amendment retaliation claim.

24cv0682

### 5. *Monell* Claim

Defendants move for summary judgment on Plaintiff's *Monell* claim against the County of San Diego. (Mot. 16:14.) With a threshold constitutional violation surviving summary judgment, the Court considers whether the County is liable under *Monell*. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Included within § 1983's definition of "persons," a municipality can be liable for constitutional violations—so-called *Monell* liability. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Importantly, one cannot sue the county on a theory of *respondeat superior*. *Id*. at 691. Instead, *Monell* liability is limited to suits for constitutional deprivations caused by the county's "officially adopted" policy statement, ordinance, regulation, or decision, or the county's unofficial but entrenched "custom [or practice]." *Id*. 690–91, 694. In short, a county is held liable when the execution of a government policy or custom inflicts the constitutional injury. *Id*. at 694.

Failure to train employees can be considered a county's policy or custom where the inadequacy reflects "deliberate indifference." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). Notice, through a pattern of similar constitutional violations by untrained employees, supports a deliberate decision. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Although a pattern is "ordinarily necessary" to demonstrate deliberate indifference, *id*. at 62, a failure to train can obviously lead to constitutional violations in a "narrow range of circumstances," *id*. at 63 (citation omitted). For example, taking into consideration "the duties assigned to specific officers," when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a county's training can reflect deliberate indifference. *City of Canton*, 489 U.S. at 390.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. The unsatisfactory training of

- 22 -

24cv0682

a particular officer cannot support *Monell* liability. *City of Canton*, 489 U.S. at 390–91. Moreover, a particular officer's mistakes will not suffice. *Id*. at 391.

Regardless of a formal policy or custom, the county can be held liable when the officer causing the underlying constitutional violation has "final policymaking authority" with "respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Effectively, the county has sanctioned that officer's actions as de facto "final policy." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988). As an extension of this reasoning, the county can be held liable for any actions approved by those with final policymaking authority. *Praprotnik*, 485 U.S. at 127. Under this so-called "ratification" theory, a plaintiff must show that the "authorized policymakers approve a subordinate's decision and the basis for it." *Id*. In other words, "a plaintiff must show that the policy maker approved of the subordinate's act" and not just that the policymaker had knowledge of it. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

Here, Defendants argue that Plaintiff's *Monell* claim fails under any theory of liability. (Mot. 17:5–6.) To start, Plaintiff alleges the County had a long-standing practice or custom of ignoring and failing to discipline deputies' violations of constitutional rights. (Opp'n 17:24–26.) Plaintiff cites at least three prior incidents for support. (Opp'n 17:26–18:10.) But a custom must be so "persistent and widespread" that it essentially becomes a "permanent and well settled city policy." *Monell*, 436 U.S. at 691. Given their varying factual circumstances and violations, the three incidents outlined by Plaintiff do not support a permanent and well settled city policy. Instead, the incidents indicate a series of isolated actions made by officers. No reasonable jury could find in Plaintiff's favor on this theory of *Monell* liability.

Plaintiff also makes failure to train and supervise arguments, but Plaintiff's arguments suggest Plaintiff was properly trained then broke away from his training. (Opp'n 18:13.) Plaintiff states, for example: "Castillero violated County policy and training by grabbing and throwing the phone out of Kimball's hand while recording." (Opp'n 20:1–2.)

24cv0682

If anything, Plaintiff's argument demonstrates the mistake of a particular officer, which as a matter of law cannot support *Monell* liability on a failure to train theory.

Turning to the last theory, ratification, Plaintiff has not identified a figure with final policymaking authority. (Opp'n 20:23–26.) Plaintiff argues that by conducting neither an internal affair nor a use of force investigation, failing to reprimand Deputy Castillero, and declining to further train Deputy Castillero, the County ratified Deputy Castillero's allegedly unconstitutional conduct. (*Id.* at 20:23–26.) But without a final policymaking authority acting or approving, Plaintiff's argument amounts to nothing more than *respondeat superior* liability, which is expressly forbidden as a matter of law.

Plaintiff cannot prevail on these theories before a reasonable jury. Accordingly, the Court grants Defendants' motion for summary judgment on the *Monell* claim.

### 6.    Fourteenth Amendment – Conditions of Confinement

Defendants move for summary judgment on Plaintiff's Fourteenth Amendment conditions of confinement claim, seeking qualified immunity. (Mot. 24:14–18.) Even if Deputy Castillero violated Plaintiff's constitutional rights, qualified immunity shields him from liability—no clearly established law put Deputy Castillero on notice that his conduct was unlawful under these circumstances.

The Court agrees with Defendants that *Taylor v. Riojas* is too factually dissimilar to place a reasonable officer on notice. (Reply 10:8–11); 592 U.S. 7, 9 (2020). There, for example, an inmate was placed in a cell with a "clogged drain in the floor to dispose of bodily wastes," so that the inmate "held his bladder for over 24 hours, but he eventually (and involuntarily) relieved himself, causing the drain to overflow and raw sewage to spill across the floor." *Taylor*, 592 U.S. at 8. Plaintiff's facts here neither rise to that level of shock or egregiousness, nor do they support an obvious constitutional violation. Accordingly, the Court grants qualified immunity as to the Fourteenth Amendment conditions of confinement claim.

24cv0682

## B.    State Law Claims

Defendants move for summary judgment on all of Plaintiff's state law claims: (1) Negligence, (2) Battery, (3) False Arrest, and (4) the Bane Act. Plaintiff brings the state law claims against both Deputy Castillero and the County of San Diego. The Court discusses each claim in turn. Defendants seek immunity from these claims.

### 1.    Negligence

Defendants move for summary judgment on Plaintiff's negligence claim. (Mot. 22:26–28.) "Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 628–29 (2013); Gov. Code § 820(a). Negligence under California law requires the following: (1) a legal duty to use due care; (2) breach of such legal duty; and (3) that the breach was a proximate or legal cause of the resulting injury. *See Ladd v. County of San Mateo*, 12 Cal.4th 913, 917 (1996); *see also USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1412 (9th Cir. 1994).

Regarding the first element, officers have a duty to exercise reasonable care when using deadly force, and by extension, excessive force. *See Hayes*, 57 Cal. 4th at 629; *see also Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011) ("The Fourth Amendment violation alleged suffices to establish the breach of a duty of care." (citation modified)). Reasonableness is determined "in light of the totality of the circumstances." *Hayes*, 57 Cal. 4th at 629. But this standard is "broader than federal Fourth Amendment law" and considers an officer's conduct prior to the use of force. *Id*. at 639.

Drawing all inferences in Plaintiff's favor, a reasonable jury could find negligence, especially when including Deputy Castillero's pre-force conduct. Accordingly, the Court denies Defendants' motion for summary judgment on the negligence claim against Deputy Castillero.

Defendants also move for summary judgment on a direct and vicarious liability negligence claim against the County of San Diego. (Mot. 23:24.) Direct liability of a public

- 25 -

24cv0682

entity must be based on "a specific statute either declaring the entity to be liable or creating a specific duty of care *apart from* the general tort principles[.]" *de Villers v. Cnty. of San Diego*, 156 Cal. App. 4th 238, 251 (2007) (emphasis in original). As articulated by the California Supreme Court:

> The Tort Claims Act draws a clear distinction between the liability of a public entity based on its own conduct, and the liability arising from the conduct of a public employee. Although the Act provides that a *public employee* generally is liable for an injury caused by his or her act or omission "to the same extent as a private person" (Gov.Code, § 820, subd. (a)) and that, when the act or omission of the public employee occurs in the scope of employment the public entity will be vicariously liable for the injury (Gov.Code, § 815.2), the Act contains *no* provision similarly providing that a *public entity* generally is liable for its own conduct or omission to the same extent as a private person or entity. Rather, the Act provides that a public entity is not liable for an injury "[e]xcept as otherwise provided by statute...."
> (Gov.Code, § 815.)

*Zelig v. Cnty. of Los Angeles*, 27 Cal. 4th 1112, 1127 (2002) (emphasis in original).

Here, Defendants note the lack of a statutory basis to hold the County of San Diego liable for negligent hiring or supervision. (Mot 23:26–27); *see also de Villers*, 156 Cal. App. 4th at 251 (finding no "case law approving a claim for direct liability" against a county for negligent hiring and supervision practices). Plaintiff did not oppose. (Opp'n 21:4–10.)

Regarding vicarious liability, Defendants argue that Plaintiff's claim against the County fails alongside the negligence claim against Deputy Castillero. But the Court finds a viable negligence claim against Deputy Castillero. The Court therefore grants

24cv0682

Defendants' motion for summary judgment on the direct liability negligence claim but denies it on the vicarious liability negligence claim against the County of San Diego.

### 2.   Battery

Defendants move for summary judgment on Plaintiff's battery claim. (Mot. 15:22–23.) To bring a battery claim, the plaintiff must allege: (1) the officer intentionally committed an act that resulted in harmful or offensive contact with the plaintiff's person; (2) the plaintiff did not consent to the contact; and (3) the contact caused harm to the plaintiff. *See Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 952 (E.D. Cal. 2011) (citation omitted). "A prima facie battery is not established unless and until plaintiff proves unreasonable force was used." *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269 (Ct. App. 1998); *see also Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999).

Here, Defendants argue that without a threshold showing of excessive force, Plaintiff's battery claim cannot stand. (Mot. 16:3–9.) But a genuine issue of material fact exists as to the excessive force claim. Accordingly, the Court denies Defendants' motion for summary judgment on the battery claim.

### 3.   False Arrest

Defendants move for summary judgment on Plaintiff's false arrest claim. (Mot. 11:21–22.) False arrest is merely "one way of committing a false imprisonment[.]" *Collins v. City & County of San Francisco*, 50 Cal. App. 3d 671, 673 (1975). False imprisonment under California law is the "unlawful violation of the personal liberty of another." *Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 757 (1997). A false imprisonment claim in the arrest context is established by the following: "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000); *see also Young*, 655 F.3d at 1169. "California state law prohibits civil liability for false arrest where an arresting officer had reasonable cause to believe the arrest was lawful." *Garcia v. Cnty. Of Merced*, 639 F.3d 1206, 1213 (9th Cir. 2011).

24cv0682

Here, Defendants argue Deputy Castillero had probable cause to make an arrest. (Mot. 13:16–18.) For the reasons articulated in footnote four, however, Deputy Castillero does not establish probable cause. Drawing reasonable inferences in Plaintiff's favor, a genuine issue of material fact remains. Accordingly, the Court denies Defendants' motion for summary judgment on the false arrest claim.

### 4.    Cal. Civil Code § 52.1(c)

Defendants move for summary judgment on Plaintiff's Bane Act claim. (Mot. 15:22–23.) The Tom Bane Civil Rights Act states, in relevant parts: "If a person […] interferes by threat, intimidation, or coercion, […] with the exercise or enjoyment by any individual […] of rights secured by the Constitution or laws of the United States," that individual may bring a civil action for damages. Cal. Civ. Code §§ 52.1(b), (c).

After analyzing several California Court of Appeal decisions, the Ninth Circuit has held that "in excessive force cases, […] § 52.1 does not require proof of coercion beyond that inherent in the underlying violation." *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018).

Here, Defendants argue Plaintiff falls short of the Bane Act requirements because he cannot establish excessive force, nor can he establish any First, Fourth, or Fourteenth Amendment constitutional violation. (Mot. 15:26–28.) But that is not so. Plaintiff maintains a genuine issue of material fact regarding a Fourth Amendment unlawful seizure claim and an excessive force violation. Accordingly, the Court denies Defendants' motion for summary judgment on the Bane Act claim.

### 5.    State Law Immunity

Defendants seek immunity from the state law actions under Government Code §§ 820.2, 815.2. (Mot. 24:19, 25:12.)    First, Defendants seek immunity for Deputy Castillero's individual conduct under Government Code § 820.2. (Mot. 24:19.) The statute provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion is abused." Cal.

24cv0682

Gov't Code § 820.2. But the immunity is limited. Section 820.2 "covers only 'policy' decisions made by a 'coordinate branch[ ] of government,' and not 'operational decision[s] by the police purporting to apply the law.'" *Sharp v. Cnty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (citing *Liberal v. Estrada*, 632 F.3d 1064, 1084 (9th Cir. 2011) (abrogated on other grounds)).

Here, given that Deputy Castillero made an on-the-ground decision to detain Plaintiff, § 820.2 immunity does not apply as a matter of law. *See, e.g.*, *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 993 (E.D. Cal. 2010), aff'd, 685 F.3d 867 (9th Cir. 2012) ("The discretionary immunity conferred by the statute [§ 820.2] is reserved for basic policy-level decision making. […] It does not protect tactical choices found to be unreasonable[.]" (citation omitted)).

Second, Defendants seek immunity for the County of San Diego. (Mot. 25:12.) Section 815.2(a) generally makes a public entity vicariously liable for injuries caused by its employees during the scope of employment. Cal. Gov't Code § 815.2(a). But, as articulated in § 815.2(b), where an employee receives immunity, a public entity will not be held vicariously liable. *Id*. § 815.2(b).

Here, given that Deputy Castillero does not receive § 820.2 "discretionary" immunity, the County cannot leverage protection from suit under § 815.2. Accordingly, Defendants' immunity arguments under § 820.2 and § 815.2 fail.

## IV.    CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.

First: the federal claims. The Court **GRANTS** the motion in Defendants' favor as to the free speech, malicious prosecution, *Monell*, and conditions of confinement claims. But the Court **DENIES** summary judgment on the unreasonable seizure claim, concluding the right clearly established under similar circumstances. The Court further **DENIES** summary judgment on the excessive force claim, finding a genuine issue of material fact.

24cv0682

Second: the state law claims. The Court **GRANTS** Defendants' motion as to the direct liability negligence claim against the County of San Diego. But the Court **DENIES** Defendants' summary judgment as to the negligence claim against Deputy Castillero and associated vicarious liability claim against the County of San Diego, the battery claim, the false arrest claim, and the Bane Act claim. Defendants cannot invoke state law immunity under Government Code §§ 820.2, 815.2.

In light of this ruling, the Court **ORDERS** the parties to contact the magistrate judge on or before March 6, 2026, to set a new scheduling order.

**IT IS SO ORDERED.**

**DATED: February 27, 2026**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

24cv0682